**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1-23-cr-320** |
| | ) | **Case No. 1-23-cr-125** |
| **GRAHAM HAUCK** | ) | |
| | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I.      INTRODUCTION**

Graham Hauck, by and through undersigned counsel, respectfully files this Memorandum in Aid of Sentencing. Mr. Hauck comes before this Court humbled and extraordinarily remorseful for his actions which have brought him before it upon accepting responsibility and entering a plea of guilty to one (1) count of Wire Fraud, in violation of 18 U.S.C. § 1343, and one (1) count of Bank Fraud, in violation of 18 U.S.C. § 1344(2). *See generally* PSR. Mr. Hauck deeply regrets the choices he made that have brought him before this Court.

*Sentencing Request*

Based upon Mr. Hauck's personal history and characteristics, the nature and circumstances of the offense, and the unlikelihood of recidivism, Mr. Hauck respectfully requests that the Court impose a sentence of thirty-six (36) months of incarceration. Such a sentence would be "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing. 18 U.S.C. § 3553(a).

**II.      MR. HAUCK'S BACKGROUND**

Mr. Hauck is a fifty (50) year old man who has been married to his wife Alixine Frick O'Malley since 2005. *See* PSR at ¶ 99. Together, they have three children – two sons and one

1

daughter, ages sixteen (16), fourteen (14), and eleven (11). *Id*. at 100. Due to his involvement in the instant offense, Mr. Hauck and his wife are now separated, an example of just one of the many collateral consequences his actions have caused. *Id.* at 99. He was born in Washington, D.C. to his parents Sheldon and Joan Hauck. *Id*. at ¶ 94. His father unfortunately passed away in 2020, but his mother is still alive and is eighty-six (86) years old. *Id*. Mr. Hauck has "fond memories" of his childhood and grew up in an upper middle-class household. *Id*. at ¶ 95. His mother and brother remain supportive of him throughout the instant offense, but his brother is especially disappointed in Mr. Hauck because he feels his brother "besmirched" the family's good name, especially the business that their father built. *Id*. at ¶ 98.  It is no surprise that the instant offense has caused great stress not only on the victims, but Mr. Hauck, his family, and his marriage. *Id*. at ¶ 99.

### III.     THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *see Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *see id.* at 51; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," *Gall*, 552 U.S. at 49-50, "make an individualized assessment based on the facts presented," *id.*, and explain how the facts relate to the purposes of sentencing. *Id*. at 53-60; *see also Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101; *Pepper*, 131 S. Ct. at 1242-43.

In order to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now

advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper* 131 S. Ct. at 1240 (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006). Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

## IV.    THE APPLICABLE U.S. SENTENCING GUIDELINES RANGE

Pursuant to U.S.S.G. § 3D1.2(d), both counts Mr. Hauck pleaded guilty to are grouped for guidelines purposes. *See* PSR at ¶ 73. Further, according to the U.S.S.G. § 3D1.3(b), in the case of counts grouped together, the offense level applicable to a Group is the offense level corresponding to the aggregated quantity of harm or loss. The parties agree that the following Sentencing Guidelines sections apply:

Count Group 1: Bank Fraud, 18 U.S.C. §1344(2)

| | |
|---|---|
| U.S.S.G. § 2B1.1(a)(1) – Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(I) – Value more than $1,500,000 but less than $3,500,000 | +16 |
| U.S.S.G. § 2B1.1(b)(2)(A)(iii) – Substantial Financial Hardship to One or More Victims | +2 |
| U.S.S.G. § 2B1.1(b)(10)(C) –Offense Involved Sophisticated Means | +2 |
| U.S.S.G. § 3E1.1(b) – Derived More Than $1 Million in Gross Receipts from One or More Financial Institutions | +2 |
| U.S.S.G. § 3B1.3 – Defendant abused a position of trust | +2 |
| **ADJUSTED OFFENSE LEVEL** | **31** |
| U.S.S.G. §3E1.1(a) – Acceptance of Responsibility | -2 |
| U.S.S.G. §3E1.1(b) – Acceptance of Responsibility | -1 |
| **TOTAL OFFENSE LEVEL** | **28[1]** |

Mr. Hauck has a criminal history score of zero (0); he, therefore, has a criminal history category of I for sentencing purposes. *See* PSR at ¶ 88. Pursuant to the plea agreement, Mr. Hauck's total offense level of twenty-eight (28) combined with a criminal history category of I produces a Guidelines' range of seventy-eight (78) to ninety-seven (97) months of incarceration.[2] *See* PSR at ¶ 172 and Sentencing Guidelines Table.

---

[1] Although the PSR recommends that Mr. Hauck is ineligible for acceptance of responsibility, according to the plea agreement and submission by the parties, the parties jointly request this Honorable Court to apply the three-level reduction pursuant to U.S.S.G. § 3E1.1.

[2] The defense objects to the total offense level of thirty-one (31) and the associated guideline range of one-hundred-and-eight (108) to one-hundred-and-thirty-five (135) months of incarceration, as these numbers do not reflect the applicable credit for acceptance of responsibility.

## V.     18 U.S.C. § 3553(a) FACTORS

As the Court is aware, the Sentencing Guidelines are not mandatory, and while the Court must consult the Guidelines and take them into account at sentencing, Section 3553(a)(1) provides a "broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *See United States v. Booker*, 125 S. Ct. 738, 767 (2005); *see also Gall*, 552 U.S. at 50 n. 6. The command is consistent with the Supreme Court's observation that "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S. Ct. at 1240 (citing *Williams v. New York*, 337 U.S. 241, 247 (1949)). It is similarly consistent with Congress' express directive that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct." *Id.* (citing 18 U.S.C. § 3661).

### A.     The Nature and Circumstances of the Offense.

Mr. Hauck's involvement in the instant offense is extraordinarily regrettable, and as he writes to the Court, "I can only accept responsibility and work each today to right the wrongs of my actions.  I am truly sorry for my actions and apologize to all the victims to which I have caused pain. These victims put their trust in me and I betrayed that trust." *See* Exhibit A. Mr. Hauck's letter is from a man who has been broken to his core and is facing the very real consequences of his actions. *Id*. What he only sees in hindsight, is that his criminal behavior not only affected those he stole from, but simultaneously devastated his family and shook their entire belief in who he was as a person. *Id*. As he recalls when he told his family about this offense, he wrote "[t]he pain in that moment for them was overwhelming. I work every day to show how sorry I am, and be a better man and father every day, one day at a time." *Id*. Mr. Hauck struggles

daily with maintaining the strength to persevere in the face of such dramatic changes. *Id*. He describes that he was "rightfully alone" when everything came to light, and the loss of clients, friends, income, reputation, and now his freedom has taken its toll on him. *Id*. However, he refuses to give up, and strives every day to be better than the day before. *Id*. He knows that he has "no one to blame but [him]self," and although "[t]he days and years ahead will be some of the toughest [he] ha[s] ever been through, [he] must persevere for the sake of [his] family and those victims who suffered at [his] hands." *Id*. Mr. Hauck knows he was living a life of lies, and not only lying to everyone else, but lying to himself. The truth is really setting Mr. Hauck free, and paving the way for him to heal and to make amends for his wrongs.

These are not just words. Mr. Hauck has put action behind his intentions. As he tells the Court, he is currently assisting his wife in growing her infant company because she now bears the burden of being not only the homemaker, but the primary breadwinner for the family. *Id*. He also consults with a friend of his in Maine, helping him navigate fundraising issues for his organization to assist immigrant children. *Id*. Although it will "take time," he is confident that he can "assist more individuals and companies as [he] restart[s] and rehabilitate[s]." *Id*. Nevertheless, Mr. Hauck is haunted by the thought of not being there for his children in their teenage years, and not being able to fulfill his mother's dream of aging at her own home. *Id*. His brother has taken on much of the burden of finding a suitable assisted living facility for their mother. *Id*. Nevertheless, he is steadfast in his gratitude for his friends who have written to the Court on his behalf, and he credits their support with helping him through these trying times. *Id*. Mr. Hauck is ready to face the sentence of the Court and will accept it with humility.

Aside from the impact his actions have had on his family and friends, Mr. Hauck is painfully aware of how he tarnished not only his own professional reputation but most

importantly, his victims' reputations. *See* Exhibits UU-YY. Mr. Hauck shows his remorse by addressing the several companies that were affected by his criminal behavior, acknowledging the betrayal of the trust they placed on him. *Id*. Specifically, Mr. Hauck admits to his victims "I made my problems your problems," understanding that he took advantage of his position to involve their finances with his own. *Id*. In doing so, Mr. Hauck is not seeking to redeem or excuse himself, much less to obtain any kind of forgiveness, but rather to take full responsibility for his actions and face the consequences head on. *Id*. Furthermore, Mr. Hauck is motivated to dedicate his time to "making things right financially" for his victims. *Id*. He has unequivocally understood the gravity of the repercussions his actions have had and will continue to have for his victims, not only financially but also reputationally. *Id*. While acknowledging and committing himself to never returning to a position of association management, he intends to place his knowledge and expertise towards redressing the financial damage he caused, all the while accepting nothing will ever fully erase the harm done. *Id*.

**B.    Mr. Hauck's Personal History and Characteristics.**

Mr. Hauck submits a remarkable forty-five (45) letters of support on his behalf for the Court to consider. *See* Exhibits A-TT. His life has been defined by his reliability, thoughtfulness, compassion, inclusivity, and his care for others. *Id*. His family, friends, and community members speak with one voice in describing that the poor decisions he made here do not align with his character as a whole. *Id*.

Alixine F. O'Malley, Mr. Hauck's wife of eighteen (18) years and partner since 1999, described that he has always made their family feel "loved, safe, and protected." *See* Exhibit B. Mr. Hauck always went out of his way to make the lives of those he loves around him better, given that "family is and has always been a priority" for him. *Id*. When Ms. O'Malley's father, who

suffers from Alzheimer's, visits their family, Mr. Hauck takes him "on long drives to see the trees and monuments he loves." *Id.* When it comes to his mother, Mr. Hauck helps her with any "challenges" she has with electronics. *Id.* Prior to his death in 2020, Mr. Hauck's father primarily depended on his son to care for him as well. *Id.* It is clear through his actions and attitude that Mr. Hauck is committed to selfless acts of love towards his family members. After the prosecution began in this case, Mr. Hauck has had "many tears these past months," adding that "the guilt is intense for him." *Id.* While carrying these feelings and the weight of the pain he caused to others, Mr. Hauck has been honest with his children about his mistakes and used them as a life lesson for the whole family. *Id.* Mr. Hauck's ability to hold himself accountable with his family by explaining what he did and why it was wrong supports the idea  that his actions in this case were a regretful deviation from his true character. Ms. O'Malley noted how Mr. Hauck's incarceration will negatively impact their family, as it will be emotionally difficult on the children and financially burdensome on Ms. O'Malley stepping into the role of a financial provider. *Id*.

In the letter submitted by Sheldon Hauck, Mr. Hauck's older brother, he provides crucial context to the circumstances that subjected Mr. Hauck to make poor and regrettable decisions. Mr. Hauck began working at their family company, Hauck & Associates, while in college in the 1990s. *See* Exhibit C. The company was founded by their father in 1974. *Id.* He described that for Mr. Hauck, it was "the only job he's ever known." *Id.* Sheldon Hauck also joined the company in 1999, however, within a few years, the success of the company declined with their father's semi-retirement. *Id.* Upon realizing that the company could not generate enough income to support both the brothers, Sheldon Hauck resigned. *Id.* This did not help in the long run, and Mr. Hauck continued to face hardships keeping Hauck & Associates afloat. *Id.*[3] In 2016, their father suffered

---

[3] When Mr. Hauck took over Hauck & Associates, he unwittingly assumed a large tax debt accrued by his father.

a stroke that caused him to lose most of his motor function and cognitive ability. *Id.* For the years that followed until their father's death in 2020, Mr. Hauck bore immense responsibilities "at the forefront" in coordinating and funding care for their parents. *Id.* In "[succumbing] to temptation," Mr. Sheldon Hauck noted it was pretty evident that his brother "was under extreme financial pressure, supporting not only his wife and children, but also our parents, all while making insufficient income from his business." *Id.* According to his brother, these circumstances led him to break the law. *Id.* Sheldon Hauck asserted that he and his own family are "collateral damage" since they now have to "shoulder the entire financial burden of providing for [his] mother..." *Id.* He also added that their mother is "collateral damage" since she can no longer rely on Mr. Hauck to care for her. *Id.* He feels that the longer a sentence this Court imposes here, the greater the collateral damage on the family will be. *Id.*

Ben Brown has also been a close friend of Mr. Hauck for approximately thirty (30) years. *See* Exhibit F. Throughout the years after meeting during college, Mr. Hauck was a groomsman at Mr. Brown's wedding, and the two were neighbors in their early thirties. *Id.* Mr. Brown considers Mr. Hauck to be "a man of exceptional integrity and character," an "amazing father," and a "faithful and loyal husband to Alix." *Id.* Having known Mr. Hauck for so long, his "jaw hit the floor" when he learned of his conviction, because his actions were "entirely out of character." *Id.* Despite his "moments of poor judgment," Mr. Brown knows he never meant to cause any harm. *Id.* He asks this Court to consider Mr. Hauck's "integrity and contributions to society, and his track record as a father and husband" to impose a lenient sentence in this case. *Id.*

Ms. O'Malley's aunt, Childs Burden, also wrote a letter of support for Mr. Hauck. *See* Exhibit G. Much like the other letters of support, Ms. Burden says glowing things about Hauck, "he has always shown the greatest care and love for Alixine and the three children. I do not believe

there is a mean bone in his body." *Id.* At the same time, she recognizes that his willingness to do anything for his family is probably what caused him to be in this position – "he fervently adores his family and perhaps this is where he took the wrong turn." *Id.* Ms. Burden lastly encouraged this Court to impose on Mr. Hauck a lenient sentence for his non-violent conduct in this case. *Id.*

Another letter was submitted by Mr. Hauck's life-long friend of forty-five (45) years, Taylor Burke. *See* Exhibit I. Mr. Burke has known Mr. Hauck since they were classmates in kindergarten. *Id.* Throughout the years, their families grew very close together as well. *Id.* Knowing Mr. Hauck to always have been "honest, giving, empathetic and wonderfully kind," the news of this conviction struck Mr. Burke as "completely out of character." *Id*. Mr. Burke added that Mr. Hauck is "hard-working," he "has integrity and honor," and his actions in this case "do not represent the ethical and moral code by which Graham lives his life." *Id*. Mr. Burke described how kind, caring, and generous Mr. Hauck is towards others. *Id.* In his letter, he shared that Mr. Hauck was "one of the first people at my side after my cancer diagnosis," by extending care, support, and making sure "all the little things were handled when I was at my weakest." *Id.* He is "forever grateful" for Mr. Hauck's acts of service and emotional support during that time. *Id.* Mr. Burke lastly comments that Mr. Hauck is sorry for what has happened, and he assures your Honor that this "will never happen again." *Id.*

Helen Clay Chacem a cousin of Ms. O'Malley, also submitted a letter of support for Mr. Hauck, and describes him as a "kind, considerate, caring man." *See* Exhibit J. He adores his children and was "often shepherding them from place to place, coordinating their friends and making everything 'go.'" *Id.* Ms. Chace comments that Mr. Hauck has a strong bond with each of his children, and that he is the "glue" to his "joyful, beautifully connected family unit." *Id.* Regarding his actions in this case, she was shocked and noted "there is nothing in his lovely

parenting and his care for his family and others that even resembles his violation of the law." *Id.*
She also noted that Mr. Hauck is always so helpful to her as she navigates technological concerns.
*Id.* Mr. Hauck spoke candidly about his legal situation with Ms. Chace, "he was vulnerable,
humble, sad, and frankly courageous in his disclosure of the current situation." *Id.* Ms. Chace takes
seriously that Mr. Hauck took responsibility for his actions because, despite his violation of the
law here, "his transparency and overwhelming sadness and shame sharing his situation with [her]
shows him to be a man of good character." *Id.* She believes that his actions in response to the
aftermath of this news are "excellent examples" for his children – teaching them to own up to their
mistakes, fix them, and create "a better course going forward." *Id.*

Courtney Chase considers Mr. Hauck a "dear friend" of almost a decade. *See* Exhibit K.
Having first spent time together at their kids' sporting events, the two and their families grew
closer over the years. *Id.* Ms. Chase knows Mr. Hauck to be a "true gentleman with a heart of gold"
and a "loving husband and father who is fiercely devoted to creating a family environment where
his children feel safe and secure." *Id.* He is also a "dutiful son" to his elderly mother and "has been
on call to navigate the various demands of her medical needs and emergencies." *Id.* She shares the
sentiment that others have noted in their letters of support, that Mr. Hauck's "significant errors in
judgment" in this case were caused by his "desire to make everyone happy." *Id.* His actions here
were, in her view, "out of character," and she opines that he could benefit from professional help
to confront his mental health and the self-sabotaging behaviors that led him before this Court. *Id.*

Sam Cross met Mr. Hauck in high school thirty-four (34) years ago, and they have
remained friends ever since. *See* Exhibit Q. Mr. Cross first importantly notes that while he does
not "profess to understand the reasons" for his actions in this case, he "immediately knew that it
had to be from an extreme stat of stress and pressure." *Id*. His actions were "out of character" given

that he has known him to be one of the "most loyal, honest dealing and hard-working people" he knows. *Id.* Mr. Cross explained that Mr. Hauck regrets his poor choices and the toll those choices have taken on his family. Mr. Cross went on to write about the two as athletes on the football team in high school and their years shared as roommates after college, during which Mr. Hauck began working at Hauck & Associates. *Id.* After meeting Ms. O'Malley, Mr. Cross watched as Mr. Hauck's "naturally supportive personality convert[ed] into that of a responsible and productive professional" in building his family's business *Id.* His "allegiance to the family he grew up with," as well as his new wife and family, are what drove Mr. Hauck's "fierce work ethic." *Id.* Mr. Cross then wrote beautifully of Mr. Hauck's love and service for his parents as they grew older. He not only responded to the call to support his elderly parents, but he "fulfilled this role completely and honorably." *Id.* Mr. Cross does not "condone" Mr. Hauck's decisions or actions, however, Mr. Cross "can't imagine the stress he must have been under to have felt compelled to make that decision." *Id.* Mr. Cross understands that while Mr. Hauck will "own" his "lapse in judgement" for the rest of his life, he hopes that this offense does not overshadow who he truly is, "a good and honorable man." *Id.*

Jack Dempster met Mr. Hauck in elementary school in 1981 and have remained close friends ever since. *See* Exhibit R. In over forty (40) years of friendship, Mr. Dempster has "only known him to be extraordinarily generous, thoughtful, and caring." *Id*. Of note is his "unwavering support" of his elderly mother, where he has "taken charge of her health, caregiving, and wellbeing." *Id*. Pertaining to their own relationship, Mr. Dempster shares a memory from 1994, when Mr. Hauck drove all the way to Knoxville, Tennessee to celebrate Mr. Dempster's birthday, coordinating for other friends to join as well. *Id*. Mr. Dempster had just transferred there for college, and he did not have many friends to celebrate his birthday. *Id.* This memory speaks to Mr.

Hauck's selflessness and someone who is "willing to go the extra (literal) miles" for those he cares about. *Id.* Mr. Dempster has also worked with Mr. Hauck in a professional capacity, in which he felt Mr. Hauck was "diligent, trustworthy, and focused" on his company and employees. *Id.* Despite Mr. Hauck's shortcomings in this case, Mr. Dempster maintains that he would not have any concerns doing business with him again in the future. *Id.* During the many times they have spoken about this offense, Mr. Hauck has shown Mr. Dempster that he is "truly remorseful" and intends to "make amends" with all those involved. *Id.* While Mr. Dempster, too, is shocked at his friend's mistakes here, he firmly believes Mr. Hauck "is a man of good character" who made "some poor decisions." *Id.* Mr. Dempster hopes this Court's sentence will "reflect his considerable, ongoing efforts" to support his family and contribution to society. *Id.*

Laura Gardner is a close family-friend of Mr. Hauck and vouches for his character as a father, husband, and friend in her letter. *See* Exhibit T. Ms. Gardner and her family spent a lot of time with Mr. Hauck and his family throughout the years "during family cook outs, watching the kids sports together, and getting some adult time when the four of us would go out together." *Id.* Mr. Hauck is not only caring and inclusive with his friends, but he also "recognized how privileged we all were, never flaunting material possessions." *Id.* For Mr. Hauck, family and friendships were more important. *Id.* She added that he often donated his time and money to his "kids' schools, coaching, and organizing groups to welcome newcomers to school…" *Id.* Ms. Gardner immensely respects that Mr. Hauck is "extremely gracious, humble, and kind…" *Id.* She explained that he is consumed with remorse and shame, which has been difficult for her to witness. *Id.* "Prison will not erase the sorrow and shame he already feels, and he will wear that scarlet letter for the rest of his life." *Id.* Ms. Gardner assures this Court that Mr. Hauck is not a "threat to society," that there is "no chance" he will reoffend, and that he has been bearing his own "personal sentence" living

with the "irreparable damage to his wife and children…" *Id.* For these reasons, she asks this Court to impose leniency in its sentencing. *Id.*

Childs Hauck also submitted a heartfelt letter in support of his father, "a dad that all fathers should strive to be." *See* Exhibit X. Childs described that his father has been an important mentor to him all his life. *Id.* He admires his father and wishes "to follow in his friendliness to others." *Id.* Aside from his "job as a role model," Mr. Hauck has a "well rounded personality that never fails to bring joy to our family." *Id.* Childs considers all the time he spent with his dad to be an "opportunity," for which he was "fortunate" to have. *Id.* He emphasized how important his father was in shaping his moral compass and it is his wish for his younger brother to have the same opportunity. *Id.* "I wouldn't be able to raise my brother like my dad would and [my] hope would be that I wouldn't be put in that position." *Id.* He noted of his sister that it is important she be raised with her father around as well. *Id.*

In Hugh Webster's letter, he describes his relationship of fifteen (15) years with Mr. Hauck. *See* Exhibit Z. Mr. Webster and Mr. Hauck's work and client base overlapped, so they worked closely on many occasions. *Id.* Every time they worked together, Graham has always demonstrated "sincere honesty and integrity." *Id.* He was not interested in taking shortcuts or pushing the bounds of what is legal. *Id.* Rather, Mr. Hauck cared to "uphold the goodwill and positive reputation of his clients and his company." *Id.* Mr. Webster has trusted Mr. Hauck enough to have referred several of his own clients to Mr. Hauck's company, "I never would have done so if I had any reservations, or questions, or reasons to be concerned about the ethics or integrity of the company or Graham personally." *Id.* Mr. Webster concluded his letter stating that Mr. Hauck's conduct is the "only such aberration from the otherwise exemplary conduct" he personally witnessed. *Id.*

Andrew Mandala met Mr. Hauck when they were thirteen (13) years old and have been friends for over thirty-five (35) years. *See* Exhibit BB. In his letter, Mr. Mandala speaks to how caring and thoughtful Mr. Hauck is. *Id.* Following the passing of Mr. Mandala's father in 2015, Mr. Mandala and Mr. Hauck spent hours processing their fathers' death, their lives, and the impact they have had on each of them. *Id.* During those difficult times, Mr. Mandala found Mr. Hauck's words to be "comforting and uplifting." *Id.* "This is who he is… a gentle giant of a man and a true friend." *Id.* Mr. Mandala was shocked by the news in this case, noting that it was "out of character." Mr. Mandala asks this Court to consider how badly Mr. Hauck has already been severely punished for his wrongdoings, having already lost his business, "irreparably damaged" his reputation, and now facing "the real possibility of losing his freedom" from spending time with his family. *Id.*

Laura Neville's letter details a sweet and impressionable gesture about Mr. Hauck, her long-term friend of over twenty (20) years. *See* Exhibit JJ. During an "incredibly scary time" when Ms. Neville underwent an emergency surgery to remove a ruptured appendix, Mr. Hauck delivered a soothing, homemade meal to her family when she returned from the hospital. *Id.* Mr. Hauck focuses on taking care of those around him, but Ms. Neville explained "when you are faced with taking care of your own family along with aging parents, the pressure can be completely overwhelming, and can cause good people to make very poor decisions." *Id.* Ms. Neville believes that circumstance applies to Mr. Hauck, who has "owned up to his financial crime, repaid the money, and is now accepting the consequence." *Id.*

Liz O'Donnell submitted a letter on behalf of her friend, Mr. Hauck, who she knew well through the community. *See* Exhibit KK. Ms. O'Donnell met Mr. Hauck eight (8) years ago through ice hockey. *Id.* Ms. O'Donnell's daughter was the only girl on the team, and Mr. Hauck actively volunteered as team manager at the time. *Id.* In her letter, she describes how committed

he was to the hockey team, often going above-and-beyond to organize team building activities or spending time complimenting each parent about their children. *Id.* "After most every game, Mr. Hauck would personally email or call to tell us how impressed he was with our girl, expressing how much he loved that she was a force to [be] reckoned with on an all boys team." *Id.* Ms. O'Donnell extends continuous support to Mr. Hauck because "he is a good person and friend, who has given so much to our community over the years." *Id.*

Justin Ochs writes his letter as a lifelong friend of Mr. Hauck. *See* Exhibit LL. Having known Mr. Hauck since 1984, Mr. Ochs admittedly has too many memories to recount in one letter. *Id.* He stated, however, that his most meaningful experience with Mr. Hauck is when the two embarked on a cross-country road trip in 1996. *Id.* Mr. Ochs was travelling to California and needed a car while he was there, so Mr. Hauck joined to accompany him on the road for two (2) weeks to ensure Mr. Ochs was not journeying alone. *Id.* For Mr. Ochs' law school graduation, Mr. Hauck again travelled for hours to Charlottesville to be there for his friend. *Id.* Mr. Hauck ensured that Mr. Ochs "felt ready to tackle what lay ahead," at his graduation ceremony, then travelled back home that same night. *Id.* As it pertains to his professional life, Mr. Ochs describes that Mr. Hauck is a hard worker, but, like other small business owners, he faced certain challenges. *Id.* "These challenges must have overwhelmed him to the breaking point. There can be no other explanation for how a man of such strong character could exhibit such an error in judgment." *Id.* Mr. Ochs respectfully urges this Court for its leniency in imposing a sentence, as his punishment not only affects him, it affects his family as well. *Id.*

Reverend Eleanor Ellsworth has known Mr. Hauck since he was in middle school. *See* Exhibit OO. In time, she also became friends with Mr. Hauck's parents, describing the family to have "strong ethical underpinnings." *Id.* Reverend Ellsworth is an Episcopal priest and states from

experience that "people sometimes do things which are out of character from their normal behaviors." *Id.* This applies to Mr. Hauck, and she believes that Mr. Hauck is experiencing deep regret for what he has done. *Id.*

Lindsay Stroud met Mr. Hauck in seventh grade and quickly became friends.  *See* Exhibit PP. They have remained friends through this day, and she writes that "Graham has meant more to me as a friend from our youth than anyone…" *Id.* Unfortunately, Mr. Stroud felt saddened by Mr. Hauck's mistakes in this case, and perceived them to be out of his character. *Id.* Mr. Hauck struggled through ridicule and public shame in the immediate aftermath of his guilty plea, and suffers through guilt having to face his children and "regain their trust." Ultimately, Ms. Stroud believes that her friend has learned from his mistakes here and will "lead a life of integrity moving forward." *Id.*

Lastly, Mr. Hauck's CPA, Robert Williams, submitted a letter of support. *See* Exhibit TT. His letter contextualizes some of the difficulties Mr. Hauck encountered at work, which led to his offense. *Id.* When the business at Hauck & Associates declined due to client turnover, Mr. Hauck did not terminate employees. *Id.* Instead, he retained them due to their "long-time tenure" with the company. *Id.* Similarly, when the COVID-19 pandemic occurred, Mr. Hauck did not terminate employees despite the company's further decline. *Id.* Recognizing that Mr. Hauck felt the need to commit these crimes to financially support others, Mr. Williams knows Mr. Hauck would have never done so "unless he had to support his family, parents, and employees." *Id.*

The remaining letters overwhelmingly continue to describe Mr. Hauck as loving, thoughtful, hardworking, generous, reliable, caring, and positive. *See generally* Exhibits D, E, H, L, M, N, O, P, S, U, V, W, Y, AA, CC, DD, EE, FF, GG, HH, II, MM, NN, QQ, RR, and SS. Knowing Mr. Hauck to embody these qualities, nearly everyone who submitted letters in support

noted their shock at this "out of character" offense. *Id.* Mr. Hauck is revered by his community as an upstanding friend, father, and husband. *Id.* With this reputation and a crumbling business, Mr. Hauck's offenses were a horrific lapse in judgement due to external pressures – not a reflection of his character. *Id.* There is resounding agreement among the letters that Mr. Hauck is remorseful, that he carries guilt and shame for his actions, and that even though his reputation and trust among his community is shattered, he holds himself accountable without offering excuses and is a man of integrity with the will to right his wrongs. He simply has so much left to contribute to society. *Id.*

### C. Mr. Hauck Poses Little Risk of Recidivism.

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Fortunately, Mr. Hauck does not fit the archetype of a person who will commit new criminal offenses or recidivate. And, because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "there is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected as the Guidelines' offense level has long been recognized as "[n]ot intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the Guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, *Booker* has freed the judiciary to remedy this inconsistency.

In addition to what has already been described about Mr. Hauck's character demonstrating his ability to reform and not recidivate, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases. *See Measuring Recidivism* at 12. More specifically with respect to Mr. Hauck, who is 50 years old and a criminal history category of I have a recidivism rate of only 6.2%. *Id.* at 28.

In fact, only 3.5% of first offenders with zero criminal history points are ever reconvicted. *U.S Sentencing Comm'n, Recidivism and the First Offender* at Exhibit 6 (May of 2004) (hereinafter *First Offender*). Only 11.7% of all first offenders ever find themselves back in the criminal justice system (defined as reconviction, re-arrest, or revocation). *First Offender* at Exhibit 6. These are Mr. Hauck's only criminal convictions, and the experience taught him a valuable life lesson to ensure he does not repeat the mistakes of the past. There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Hauck would commit any criminal offense in the future.

It is unfortunate that the Guidelines' offense levels do not take into consideration such data. This data exists yet is not utilized to inform the Commission's rulemaking. However, without even considering the circumstances of the offense, it is apparent that Mr. Hauck is not a person who is statistically likely to recidivate. And, when one considers such statistics in light of Mr. Hauck's history, employment, community involvement, and support system, it is safe to assume that he will never again be arrested or charged with an offense.

### F.  Mr. Hauck's Public Demise is Adequate Deterrence to Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct."  Arguably, the government already

substantially achieved the maximal deterrent effect of Mr. Hauck's offense simply by charging and convicting him. As a result, Mr. Hauck's name and the substance of his offense will be discussed in numerous conversations and settings among family, friends, and the community for years to come, a shameful reality from which he simply cannot escape. In short, Mr. Hauck's public demise sends a strong message to anyone foolish enough to engage in similar offenses.

## VI.    CONCLUSION

In light of the above, Mr. Hauck, by and through undersigned counsel, respectfully requests that the Court impose a sentence of thirty-six (36) months of incarceration.

Respectfully submitted,

_____/s/_____
David Benowitz
DC Bar # 451557
Price Benowitz LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
Tel:  (202) 417-6000
Fax:  (202) 664-1331
David@PriceBenowitz.com
*Counsel for Graham Hauck*

## **CERTIFICATION**

I HEREBY CERTIFY that on this 1st day of May 2024, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via CM/ECF to all parties.


_____/s/_____
David Benowitz